CARTER OIL COMPANY *v.* WEIL.

4-7798                                    192 S. W. 2d 215

Opinion delivered January 28, 1946.

Hearing denied February 25, 1946.

*Smith & Sanderson, Arnold & Arnold* and *Gaughan, McClellan & Gaughan,* for appellant.

*Barney & Quinn* and *Shaver, Stewart & Jones,* for appellee.

SMITH, J.  On December 9, 1921, the Four States Lumber Company, a corporation, hereinafter referred to as the Company, was the owner of the 40-acre tract of land which is the subject of this litigation.  The officers of the Company were: Leo Krouse, president; I. J. Kosminsky, secretary; Allen Winham, Jr., assistant secretary; and Fred Offenhauser was a stockholder and one of the directors.  All of these persons except Winham were dead at the time the testimony was taken on which the case was submitted and decided in the court below.  On the date mentioned the Company conveyed the land by warranty deed to Nick Harvey.  Following the habendum clause in the deed appeared this separate paragraph:  "It is expressly understood that a one-half undivided interest is reserved to the said Four States Lumber Company in all oil and mineral rights."

By mesne conveyances numerous persons have acquired various interests through Nick Harvey, the grantee in the deed, and this suit was filed against them by plaintiffs, who had acquired, and now own, the interest in the oil and minerals which the grantor reserved, to cancel the conveyances under which claims are asserted to the undivided one-half interest and for an accounting for the oil and gas produced from the land.  The relief prayed was granted, and from that decree is this appeal.

Answers were filed, alleging the invalidity of the reservation of the undivided one-half interest in the oil and gas, and alleging also that its insertion in the deed was the result either of a mutual mistake or of an intentional fraud, and reformation of this deed was prayed, which relief was denied.

We consider first the question of the right to have the deed reformed.  Harvey testified that he purchased the land for a cash consideration of $450, and that he

refused to accept a deed containing the reservation, and that the Company's agent assured him that he would procure a deed which did not contain that reservation, and another deed was delivered to him which, like the first, contained the reservation, but he was assured that it did not; that he is an illiterate man, and did not know a fraud had been practiced when the second deed was delivered.

The testimony of Harvey is corroborated by that of one Arthur Gurley, who testified that he, as the agent of the Company, negotiated the sale and delivered both deeds; that he reported to the Company's officers that Harvey would not accept a deed containing the mineral reservation, and that he was assured that another deed would be prepared omitting it, and that he supposed this had been done, and that when he delivered the second deed he assured Harvey that this had been done.

The chancellor did not credit this testimony, nor do we. The Company surrendered its charter in 1923 after disposing of its lands. Winham testified that as assistant secretary he kept the Company's records from March 15, 1917, until the dissolution of the corporation, and that practically all the Company's records have been lost or destroyed. As assistant secretary he prepared practically all the deeds, and that he wrote the deed in question. It was the invariable practice of the Company to insert the mineral reservation in all the deeds it executed, and that this reservation was printed in the blank form of deeds used by the Company, but that the deed in question was typewritten on legal size paper, and he remembers the deed because of that fact, as he wrote the deed. He knew nothing about Harvey's refusal to accept the first deed, and so far as he was aware only one deed to Harvey had ever been written. Winham further testified that he had known Gurley for twenty-five years, and that Gurley never represented the Company, had never handled any business for the Company, was never its agent, and was never authorized to sell lands for the Company.

One Armstrong testified that he was employed by the Company in the sale of its lands from 1919 until the Company was dissolved, and that he never heard of Gurley representing the Company in any matter.

It appears highly improbable to us that Gurley, after promising Harvey to secure a deed which did not contain the mineral reservation, would deliver a deed which did contain it.

In view of the rule established by many decisions of this court that deeds will be reformed only upon testimony that is clear and convincing, we think the court properly refused reformation.

It appears that one of the grantees claiming not from but through Harvey procured an abstract of the title to this tract of land, and had the title examined by a highly competent attorney and title examiner, and on a page of the abstract containing a copy of the deed to Harvey the examiner made the notation: "Under the authority of *Cole* v. *Collie,* 131 Ark. 103, 198 S. W. 710, our opinion is that the reservation is void." This notation was signed by the examiner. The land was purchased in reliance upon this opinion.

It is insisted that, inasmuch as the case of *Cole* v. *Collie* had not been overruled at the time of this purchase, the parties had the right to rely upon that case as supporting the examiner's opinion, and that the case of *Beasley* v. *Shinn,* 201 Ark. 31, 144 S. W. 2d 710, 131 A. L. R. 1234, which overruled the Cole case, does not apply under the facts in the instant case; and further that the Beasley case should be construed as operating only prospectively.

We think no valid distinction can be made between the instant case and the Beasley case, as the deed there construed had been executed subsequent to the Cole case and before that case had been overruled; and we are, therefore, of the opinion that the law as announced in the Beasley case applies here.

There remains, therefore, only the question whether the opinion in the Beasley case should be construed as operating only prospectively and as having no controlling effect upon deeds executed prior to its rendition.

It will presently appear that the Beasley case is not the only one which overruled the Cole case.

It must be confessed that this court has not been consistent in its holdings as to the effect to be given recitals found in the habendum or other clauses of a deed conflicting with those found in the granting clause.

It is urged that under the rule of *stare decisis* the authority of the Cole case should not be impaired, but that if this is done the impairment should operate only prospectively, having no effect upon titles acquired while the Cole case was the declared law.

It may be answered that, if the rule of *stare decisis* prevents a change in a holding of this court which affects rights acquired under a previous holding, the Cole case itself violates that rule, as it contravenes the first holding of this court on the question now under consideration announced in the case of *Doe, Ex. Dem., Phillips' Heirs, v. Porter,* 3 Ark. 18, 36 Am. Dec. 448. In the case just cited, it was held to quote from the headnotes, that "All deeds are to be construed favorably, and as near the intention of the parties as possible, consistently with the rules of law.

"The construction ought to be put on the entire deed, and every part of it, for the whole deed ought to stand together, if practicable, and every sentence and word of it be made to operate and take effect.

"If two clauses in a deed stand in irreconcilable conflict to each other, the first clause shall prevail, and the latter be regarded as inoperative; and the law will construe that part of a deed to precede which ought to take precedence, no matter in what part of the instrument it may be found."

This holding cannot be reconciled with the *Cole v. Collie* case, which did not indicate any intention of over-

ruling the Doe case, *supra.* If the Doe case is sound law, and it has never been overruled, the *Cole* v. *Collie* case was unsound, and it would necessarily follow that the undivided half interest in the oil and mineral rights here involved were not conveyed, but were expressly reserved.

Now, it is true, of course, that the Cole case is a later case, and insofar as the cases are in conflict the last case would control; but the point is that cases, even those under which property rights were acquired, may be overruled.

Chancellor Kent, in his Commentaries, vol. 1, p. 477, warns against the use of this power, which inheres in courts of last resort, for the reason that the law should be certain, and that rights acquired under earlier decisions should not be lightly disturbed; but he then proceeds to say: "But I wish not to be understood to press too strongly the doctrine of *stare decisis,* when I recollect that there are more than one hundred cases to be pointed out in the English and American books of reports, which have been overruled, doubted, or limited in their application. (This text was written more than a hundred years ago, and such cases now number, not hundreds, but thousands.) It is probable that the records of many of the courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error. Even a series of decisions are not always conclusive evidence of what is law; and the revision of a decision very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule, and the extent of property to be affected by a change of it."

Blackstone, in his Commentaries, vol. 1, p. 70, expresses the same views. The courts' power and duty, in proper circumstances, to overrule cases, is recognized by him, and he says: "For if it be found that the former decision is manifestly absurd or unjust, it is declared,

not that such a sentence was *bad* law, but that it *was not law*; that is, that it is not the established custom of the realm, as has been erroneously determined."

This view is criticized in two recent very learned articles in the Columbia Law Review, vol. XVII, No. 7, p. 593, and vol. XVIII, No. 1, p. 230; but it is the view expressed by Chief Justice Cockrill, who would have adorned any Bench, in the case of *Taliaferro* v. *Barnett*, 47 Ark. 359, 1 S. W. 702, in which case he said: "A decision of this court is adhered to in all subsequent stages of the same case, although it may be clearly erroneous. It becomes an adjudication between the parties to the suit from which the Supreme Court itself is not, upon a second appeal, at liberty to depart. But strangers to the suit acquire no such right, nor, indeed, any right to the decision in any case, further than it may be as a guide to their conduct. An exception is made, by statute, as to some criminal acts. Mansf. Dig., § 6340. A decision of the court when overruled stands as though it had never been, and the court in the reversing judgment declares what the rule of law was in fact when the erroneous decision was made."

The power of the court to overrule the case of *Cole* v. *Collie* is expressly conceded in the able brief filed by learned counsel for appellants; and the right of the court to refuse to make its opinion prospective only is also conceded in the brief.

This view comports with the decision of the Supreme Court of the United States in the case of *Great Northern Ry. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 53 S. Ct. 145, 77 L. Ed. 360, 85 A. L. R. 254. That court reviewed a decision of the Supreme Court of Montana in which a prior decision of the Montana court had been overruled; but it was held that retroactive effect would not be given to the opinion. The right of the court to thus limit the effect of the decision was challenged on the appeal to the Supreme Court of the United States; but the right was upheld. Justice Cardozo, speaking for the court, there said: "The choice for any state may be

determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts. The State of Montana has told us by the voice of her highest court that with these alternative methods open to her, her preference is for the first. In making this choice, she is declaring common law for those within her borders. The common law as administered by her judges ascribes to the decisions of her highest court a power to bind and loose that is unextinguished, for intermediate transactions, by a decision overruling them. As applied to such transactions we may say of the earlier decision that it has not been overruled at all. It has been translated into a judgment of affirmance and recognized as law anew.''

It will be observed that the Supreme Court of the United States did not say that the Supreme Court of Montana should have held as it did. It was decided only that the Montana court had this power.

But we do not elect to use that power. If so used the use would not be consonant with Judge COCKRILL's statement in the Taliaferro case from which we have just quoted.

Now, courts do not make the law. Their function is to declare what is law, and their declaration as to what is law is the highest and the conclusive evidence of that fact, and remains so until changed by a subsequent declaration or by legislative or constitutional enactment. But in the meantime no one can be said to have acquired a vested right to have the benefit of an erroneous decision.

But we are not presently overruling cases. On the contrary, we are upholding recent cases which received our most careful consideration. Those cases are: *Luther* v. *Patman,* 200 Ark. 853, 141 S. W. 2d 42; *Beasley* v. *Shinn,* 201 Ark. 31, 144 S. W. 2d 710, 131 A. L. R. 1234; *Stewart* v. *Warren,* 202 Ark. 873, 153 S. W. 2d 545.

In the case of *Mason* v. *Jackson,* 194 Ark. 236, 106 S. W. 2d 610, 111 A. L. R. 1071, the case of *Cole* v. *Collie*

was cited and approved, and this was done for the reason, there stated, that a recital in the habendum clause would be disregarded if in conflict with the recital of the granting clause. The reading of the opinion in the Mason case can leave no doubt that the opinion flaunted the express unambiguous intent of the parties, because it was believed that this rule of construction required that holding. The necessary and inevitable effect of that opinion was to give the grantee something he had not bought and to take from the grantor an interest he had expressly reserved. Any rule of construction leading to that result must necessarily be unsound, unjust, and illogical; and we so stated when the question was next presented in the case of *Luther* v. *Patman, supra.* In that case Mr. Justice HUMPHREYS, speaking for an undivided court, quoted with approval the statement of the law from 16 Am. Jur., § 237, p. 570, to the following effect: That the modern and now widely accepted rule to determine the estate conveyed by a deed with inconsistent clauses has for its cardinal principle the proposition that if the intention of the parties is apparent from examination of the deed "from its four corners" without regard to its technical and formal divisions, it will be given effect even though, in doing so, technical rules of construction will be violated. And, further, that, under this view the rule that an habendum clause creating an estate contradictory of or repugnant to that in the granting clause must be rejected, is not a rule of property, but is merely a rule of construction, which will be resorted to only where the court cannot determine which of the clauses was intended to be controlling, and that the intention of the parties, if it can be gathered from the instrument in the entirety, must control.

The case of *Luther* v. *Patman* did not expressly overrule either the case of *Cole* v. *Collie* or *Mason* v. *Jackson,* which approved it; but it did necessarily impair and destroy their authority as to the effect of this rule of construction.

Following the *Luther* v. *Patman* case came the case of *Beasley* v. *Shinn, supra,* in which we said: "To the

extent that this opinion conflicts with *Mason* v. *Jackson, supra,* and other cases involving mineral reservations they are overruled."

The opinion in the Beasley case gave effect to a mineral reservation, and if it had been intended that this case overruling others should be given prospective effect only, that fact should and would have been stated, as the deed there construed was dated August 26, 1927, a date long subsequent to the date of the rendition of the opinion in the *Cole* v. *Collie* case.

It may be true that the parties to the Beasley case were unaware of the holding in the *Cole* v. *Collie* case, and did not rely upon it; while here they were aware of the case and did rely upon it. But this is not a controlling difference. The law would be rendered too uncertain for practical enforcement if an application or lack of application of a rule of construction were made dependent upon proof of a party's knowledge of that rule. We would not know how to construe a deed until we first knew what the party's knowledge was, which might be present in one case and absent in another.

Next came the case of *Stewart* v. *Warren, supra,* which expressly approved the Beasley case, and it would now be vacillation to the nth degree to overrule those three cases above cited, which all disapproved the case of *Mason* v. *Jackson* and necessarily the case of *Cole* v. *Collie,* also.

As pointed out in the text cited and approved by Justice HUMPHREYS in the *Luther* v. *Patman* case, we have not changed a rule of property, but only refused to follow a rule of construction which was believed to be illogical, unsound, and unjust.

It is with great reluctance that a court overrules a prior decision, even though it is not a rule of property, and one of the chief reasons for this reluctance is that the change may disturb rights which apparently had vested. Of course, if such an opinion were applied pros-

pectively only, it would not have that effect, and courts would be less reluctant to overrule a case.

The instant case demonstrates the wisdom of the change of the rule of construction, and the fact that the beneficial results to be obtained by a departure from the rule stated in *Cole* v. *Collie* will greatly exceed any disastrous effects likely to flow therefrom. This departure will, in the instant case and all other similar cases, operate to prevent the grantee being given an interest he had not bought and taking from the grantor an interest which he reserved and had not sold.

These views are in accord with the decree of the court below, and, it is, therefore, affirmed.

ROBINS, J. (dissenting). I respectfully dissent.

The decision of the majority in this case is a far-reaching one.

For the first time in the history of the state, the Arkansas Supreme Court is today saying that an investor who, in buying land, implicitly relies on an unequivocal declaration by this court that such a conveyance as he is obtaining will vest in the purchaser good title to the property he is paying for, must lose his investment if, years afterwards, this court decides to overrule the decision on which the investor properly, and necessarily, relied.

One effect of the rule being announced today is that henceforth a lawyer who examines titles to Arkansas lands must not only know what this court has, heretofore, held as to the meaning and operation of a given form of deed, but he must also know what this court will say about this same kind of deed in the future.

In my humble opinion, this rule is not good law, and it contravenes, in a dangerous way, sound public policy. Stability of contracts is a prime essential to our economy. To destroy this stability is to invite chaos.

In the case at bar it is undisputed that:

First. Under the law of this state, as declared in 1917 by its highest court, in the case of *Cole* v. *Collie*, 131 Ark. 103, 198 S. W. 710, and in other similar cases, in force on the date of the deed of the Four States Lumber Company to Harvey, and on the date of Harvey's deed to appellant Collins, the reservation of mineral rights in the lumber company's deed to Harvey was a nullity, and Harvey's deed to Collins was effective to convey the fee simple title, including all mineral rights, to Collins.

Second. Before Collins bought the land from Harvey he consulted one of the leading lawyers of Arkansas, who advised Collins, citing *Cole* v. *Collie*, 131 Ark. 103, 198 S. W. 710, that the attempted reservation in the lumber company's deed to Harvey was void, and that Harvey could convey a good title to the mineral rights; and that, relying on this pronouncement of the Supreme Court of Arkansas to the effect that a mineral reservation such as was attempted in the lumber company's deed was a nullity, Collins invested his money in the land and took a deed from Harvey.

Third. Collins and Harvey both testified that Harvey understood that he was selling and Collins understood he was buying the mineral rights in this land.

So, here we have a situation where a man made an investment on the faith of what this court said the law was; and now, because, twenty-three years afterwards, this court recanted and changed its mind about the law, the investor must lose his investment.

The decision in the case of *Cole* v. *Collie* was never overruled until it was nullified by the language of this court in the case of *Beasley* v. *Shinn*, 201 Ark. 31, 144 S. W. 2d 710, 131 A. L. R. 1234.

I have no quarrel with the result in *Beasley* v. *Shinn*. As the court in its opinion in that case pointed out, the facts there shown justified a reformation of the deed involved so as to include therein in unmistakable terms the reservation of mineral rights that all parties thereto agreed was intended. In reality, that part of the opin-

ion relating to overruling of former decisions was unnecessary, because these decisions did not stand in the way of the result that was achieved. There is no need to resort to *any* rule of construction when there is no dispute among the parties to a contract as to what the contract means. It would have been entirely proper for the opinion to have set forth that the court was re-examining the rule laid down in *Cole* v. *Collie, supra,* and other kindred cases; and thus the bar and the citizens would have been put upon notice that the rule might be changed in the future, thereby precluding blind reliance upon it by investors. Frequently, in the past, when the court purposed to change a rule, even in matters of procedure, it has been deemed proper to give some warning of the impending change. See *Anheuser-Busch, Inc.,* v. *Manion,* 193 Ark. 405, 100 S. W. 2d 672.

A rule of this court, under which a particular construction is accorded to a deed whereby real estate is conveyed, if not a rule of property, is certainly such a rule as vitally affects property rights, and it ought never to be suddenly changed without some sort of warning that such a change is being contemplated. Therefore, even though this court in the opinion in the case of *Beasley* v. *Shinn, supra,* did not limit its operation so as to prevent its being retroactive in effect, I think we should so construe it, especially insofar as it affects the rights of one who, like the appellant Collins, went to the trouble of ascertaining what this court had said and relied thereon, in spending his money.

It is conceded that, if the decision in *Cole* v. *Collie, supra,* had been made in construction of a statutory or constitutional provision, it would have become a rule of property and its overruling could not affect adversely investments made on the faith of it. In such a case it is held that the decision becomes in reality a part of the law and an overruling thereof cannot affect vested rights because of constitutional bans on retroactive laws. But it is held by the majority that no such restraint on the power of the court exists when this court purposes to

overrule a decision on a question of common or general law.

Why should there be any difference in the two situations? The reason the framers of the constitution saw fit to forbid retroactive statutes was a realization of the stark injustice of such legislation. They did not believe that, once men had invested their savings on the faith of the law, they should be impoverished because legislatures might afterwards see fit to alter the law. Ought not this court have the same regard for stability and the same zeal to create and maintain confidence as inspired the wise men who wrote our constitution?

Many rules of great importance in conveyancing depend for their existence, not on legislative enactments, but on decisions of the Supreme Court of Arkansas construing the language of deeds and other conveyances. Every day trades are made and property changes hands under contracts that are made on the faith—not of any statute—but of what the judges of this court have solemnly said these contracts mean—what obligations are imposed by them and rights are acquired by virtue of them. Examples of this statement may be multiplied. One example is the effect, under the decisions of this court, of a conveyance of land to a man and his wife. Without any statutory authority whatever this court has, time and again, held that by such a deed there is created a joint tenancy with right of survivorship, instead of a tenancy in common, as would be the case if two persons not husband and wife were the grantees. The principal reason for the genesis of this rule was the ancient idea of merger of identity between those who took the vows that made them man and wife. Now, this unity of spouses has largely been annihilated by constitutional provisions, statutes and court decisions.

Should this court some day come to the conclusion that, since the ancient reasons for the rule construing into existence a joint tenancy, with survivorship, under such a deed have failed, the rule itself should fail, would this be another case for the retroactive enforcement of

the overruling decision? Would all those investors who have been buying from the surviving joint tenant, because the Supreme Court of Arkansas has repeatedly said that the surviving joint tenant had complete title, awaken to find that their confidence had been misplaced and that in reality they owned only half of the title?

Dealing with this very question, the Kentucky Court of Appeals, in the case of *Mutual Life Insurance Company* v. *Bryant,* 296 Ky. 815, 177 S. W. 2d 588, 153 A. L. R. 422, said: "It is insisted for appellant that in the event we overrule the minority rule and adhere to the majority rule, the opinion should be given a retroactive effect and applied to all such contracts entered into subsequent to the opinion in the O'Brien case, 155 Ky. 498, 159 S. W. 134, because the overruled opinions do not involve the construction of any statutory or constitutional provision, but are mere decisions expressive of general or common law. . . . Since the decisions of a court of last resort is the law of the state, whether it be the construction of a statutory or constitutional provision, or an expression of general or common law, we are not favorably impressed with the vague distinction drawn by the authorities, *supra.*"

The majority, to sustain its position, adopts and applies the philosophy expounded by Blackstone and other early English jurists to the effect that, when a court finds that its previous decision is erroneous and overrules it, the earlier decision must be regarded as never having existed. In other words, according to the majority, the law, as declared by the later decision has always existed in some Utopia, beyond the ken of mortals, whence it was evoked and put in operation by an enlightened court—and the previous erroneous decision should be deemed as never having had any existence.

Mr. Justice CARDOZO, in discussing the subject here involved, said in the case of *Great Northern Railway Company* v. *Sunburst Oil & Refining Company,* 287 U. S. 358, 53 S. Ct. 145, 77 L. Ed. 360, 85 A. L. R. 254: "A state in defining the limits of adherence to precedent may

make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. Indeed there are cases intimating, too broadly (cf. *Tidal Oil Company* v. *Flanagan,* 263 U. S. 444, 68 L. Ed. 382, 44 S. St. 197, *supra*), that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted. . . . On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration, as law from the beginning. . . . The alternative is the same whether the subject of the new decision is common law.''

Chancellor KENT, in the case of *Lyon* v. *Richmond,* 2 Johns. Chr. 51, said: ''A subsequent decision of a higher court, in a different case, giving a different exposition of a point of law from the one declared and known when a settlement between parties takes place, cannot have a retrospective effect and overturn such settlement, . . . and, to permit a subsequent judicial decision in any one given case, on a point of law, to open or annul everything that has been done in other cases of the like kind, for years before, under a different understanding of the law, would lead to most mischievous consequences.''

In the case of *Hill* v. *Atlantic & North Carolina Railroad Co.,* 143 N. C. 539, 55 S. E. 854, 9 L. R. A., N. S., 606, it was said: ''The people are supposed to have confidence in their highest court, at least to the extent of ascribing to it the virtue of consistency and a desire to see that by no lack of stability in its decisions shall any citizen be jeopardized or prejudiced in his rights because he has simply acted upon the supposition that what the court has so solemnly determined will again be its decision upon the same state of facts, or that at least

if it does change its mind, his rights and interests will be thoroughly safeguarded."

"Parties have the right to act upon the decisions of this court in acquiring titles and such titles will not be disturbed or the parties prejudiced by a subsequent reversal of the decision." *Jones v. Williams,* 155 N. C. 179, 71 S. E. 222, 36 L. R. A., N. S. 426.

The Georgia Court of Appeals, discussing the effect of decisions overruling previous decisions of the same court, in the case of *Mutual Life Insurance Company of New York* v. *Barron,* 70 Ga. App. 454, 28 S. E. 2d 334, said: "But there is an exception to the general rule, to-wit: 'An overruling decision cannot operate retrospectively so as to impair the obligations of contracts entered into, or injuriously affect vested rights acquired, in reliance on the overruled decision.' 21 C. J. S., Courts, § 194, p. 329. . . ."

This was said by the Supreme Court of Oklahoma in the case of *Oklahoma County* v. *Qeen City Lodge No. 197, I. O. O. F.,* 156 P. 2d 340: "Though some courts and legal minds differ, we find much respectable authority to the effect that the overruling decision may, in the legal and equitable discretion of the court, be made to operate prospectively only. The rule is almost universal in the protection of property and contract rights. . . ."

In the case of *Jones* v. *Woodstock Iron Company,* 95 Ala. 551, 10 So. 635, the Supreme Court of Alabama had to deal with almost the identical problem that we have in the instant case. In many of the earlier decisions of the Alabama court the authority of the chancery court to vest, by decree, the legal title to property was upheld. A later decision, *Prewitt* v. *Ashford,* 90 Ala. 294, 7 So. 831, declared that the chancery court did not possess such authority. In the Jones case, *supra,* the overruling decision was urged to defeat a title acquired while the earlier rule was in force. Refusing to give the overruling decision this effect, the court in that case said: "This early decision has become a rule of property, and to hold

otherwise now would upset a great many legal titles. . . ."

I conclude that sound authority, as well as reason and justice, dictates that, when a citizen invests his money on the assurance by the highest court of the state that he is getting good title, he ought not to be deprived of the property so acquired by him simply because the same court at a later date changes its mind and over-rules the decision relied on by the investor.

I am authorized to state that Mr. Justice HOLT and Mr. Justice MILLWEE join in this dissent.