Stanley DICKSON et al *v.*
E. F. RENFRO et al

77-403                                    569 S.W. 2d 66

Opinion delivered June 26, 1978
(In Banc)
[Rehearing denied September 11, 1978.]

*Phillip E. Norvell* and *Keith, Clegg & Eckert,* for appellants.

*Woodward & Kinard,* and *Robert R. Wright,* for appellees.

GEORGE ROSE SMITH, Justice. In 1976 a producing oil and gas well was completed on a 76-acre tract of land in Columbia county. The six appellants, claiming an undivided two-thirds contingent interest in the land under the peculiar wording of a deed executed in 1920, brought this suit to protect their contingent interest in the royalties to be derived from the well. Both sides filed motions for summary judgment. The chancellor did not find it necessary to construe the 1920 deed, because he found the appellants' claims to be barred by a 1928 foreclosure suit and by limitations and laches. He therefore granted the defendants' motion for summary judgment. We hold that the chancellor erred in entering the summary judgment, which makes it also necessary for us to construe the 1920 deed.

In 1918 the land was owned by M. J. Lecroy, who mortgaged it to W. S. McKissack to secure a $550 debt. Lecroy died in about 1919, survived by his widow, Maude, an adult son, Gus, and two adult daughters, Carrie Dickson and Omie Lecroy. In 1920 the widow and the two daughters conveyed their interest to Gus and his wife Mattie, the granting clause containing this language:

> . . . do hereby grant, bargain, sell, and convey unto the said Gus Lecroy, and Mattie Lecroy, and unto their heirs and assigns, forever, if Gus and Mattie Lecroy have no heirs then to the heirs of Carrie Dickson, and Omie Lecroy, the following lands . . .

The habendum, covenants of warranty, and release of dower and homestead were in the usual form.

In 1928 McKissack brought suit to foreclose the mortgage. The widow and three children were the defendants. The complaint alleged, as a basis for a personal judgment, that Gus had assumed the payment of the mortgage indebtedness as the consideration for the 1920 deed. The foreclosure decree also recited that the consideration for the deed to Gus had been that he assume the payment of the note secured by the mortgage. The decree, in the usual form, included a personal judgment against Gus. McKissack bought the land at the sale and received a commissioner's deed to it. About ten months later he sold the land back to Gus Lecroy for a recited consideration of $698. We may surmise that the land is unimproved, because the motions for summary judgment make no reference to actual possession by anyone.

Omie died in 1945, survived by one son, who is a plaintiff. Carrie died in 1967, survived by five children, who are the other plaintiffs. Gus and Mattie had no children. Gus died in 1972. Mattie is still living and in 1976, at the age of 85, adopted a daughter, the defendant Opal Renfro. As we have said, oil and gas were discovered on the land in 1976. This suit was filed later that year. There are 15 defendants in all, but, except for Opal Renfro and Mattie Lecroy, the abstract does not disclose what interest they assert in the property.

We consider first the effect of the 1928 foreclosure decree. Of course, as far as the mortgage was concerned, that decree extinguished the defendants' equity of redemption. But Gus Lecroy had obtained his sisters' two-thirds interest by agreeing to pay the mortgage debt. The grantors did not convey all their interest in the land, because the granting clause created an estate in their "heirs" if Gus died without

"heirs." Consequently, when Gus repurchased the land from McKissack soon after the foreclosure sale, his purchase amounted under familiar principles of law to a redemption in favor of his sisters and their "heirs." See *Slinkard* v. *Caldwell*, 208 Ark. 398, 186 S.W. 2d 431 (1945); *Lewis* v. *Bush*, 171 Ark. 192, 283 S.W. 377 (1926); and other similar cases. Thus the effect of Gus's redemption was to erase the foreclosure proceedings, leaving the parties in their original positions with respect to the title. We note in passing that the essential facts were all a matter of record and therefore in the chain of title.

We turn next to the interpretation of the 1920 deed, which conveyed the land to Gus and Mattie and their heirs and assigns forever, [but] "if Gus and Mattie have no heirs then to the heirs of Carrie Dickson, and Omie Lecroy." It is our rule to construe deeds as a whole, giving effect if possible to all the language in our effort to carry out the intention of the parties. *Carter Oil Co.* v. *Weil*, 209 Ark. 653, 192 S.W. 2d 215 (1946). Here the word "heirs" was plainly intended to mean children or descendants, as it has often been construed in similar situations. *Dyer* v. *Lane*, 202 Ark. 571, 151 S.W. 2d 678 (1941); *Powell* v. *Hayes*, 176 Ark. 660, 3 S.W. 2d 974 (1928); *Robinson* v. *Bishop*, 23 Ark. 378 (1861); Restatement, Property, § 267, Comment *c* (1940). As we reasoned about an analogous problem in *Dyer* v. *Lane, supra,* the statement that if Gus died without "heirs" the property should go to his sisters' heirs would be meaningless if the word "heirs" did not mean children, because Gus could not die without heirs in the broader sense if his sisters or their descendants were living.

Two minor arguments by the appellees do not require extended discussion. The rule against perpetuities was not applicable to the 1920 deed. All five parties to the deed must be included as the measuring lives; so the title had to vest at the death of the last survivor, well within the time allowed by the rule. Restatement, Property, § 374 (1944). Mattie's adopted daughter cannot qualify as an "heir" within the intent of the 1920 deed. For one thing, an adopted child is not a bodily heir within the meaning of a prior conveyance. *Nuckolls* v. *Mantooth*, 234 Ark. 64, 350 S.W. 2d 512 (1961). For

another, the deed, as we construe it, was to Gus and Mattie and their children, not to the children of either of them separately.

Finally, the defendants' motion for summary judgment states no facts, other than the ones we have narrated, to show that the plaintiffs are barred by limitations or laches. We need not determine whether the plaintiffs' estate is a contingent remainder or an executory interest, for in either case it did not become a possessory estate at least until Gus's death, if not until Mattie's. See Restatement, Property, § 267, Comment *a*; Simes & Smith, Future Interests, § 222 (2d ed., 1956); and compare *Horsley* v. *Hilburn,* 44 Ark. 458 (1884), and later cases treating contingent remainders in Arkansas.

The appellants, not having a possessory estate, could not have asserted any cause of action so long as Gus was living. Ordinarily a remainderman is not affected by adverse possession during the lifetime of the life tenant, because he has no right of entry. *Smith* v. *Kappler,* 220 Ark. 10, 245 S.W. 2d 809 (1952). Here the case is even stronger, because the *identity* of the "heirs" of Carrie and Omie could not be determined at least until Gus's death, if not Mattie's. The defendants' motion for summary judgment asserts no facts suggesting that any basis for a finding of limitations or laches arose after Gus's death in 1972. That question therefore remains open, for the appellants are mistaken in arguing that when both sides file motions for summary judgment they impliedly agree that there is no issue of fact in the case. *Wood* v. *Lathrop,* 249 Ark. 376, 459 S.W. 2d 808 (1970). This opinion merely disposes of issues of law raised by the trial court's action in granting the defendants' motion for summary judgment. The court expresses no opinion upon issues of fact that may be raised by either party at a trial on the merits.

Reversed and remanded for further proceedings.

HOLT, J., not participating.

Special Justice JIMASON J. DAGGETT and BYRD and HICKMAN, JJ., dissent.

JIMASON J. DAGGETT, Special Justice, dissenting. I respect-

fully dissent from the majority opinion herein. The case is presented to us on Motions for Summary Judgment. Thus the facts are undisputed. It seems to me that the majority opinion completely overlooks the conclusive *evidentiary effect* of the passage of time in this case. I can agree with the majority opinion, save and except the language therein where it is stated that "when Gus re-purchased the land from McKissack, soon after the foreclosure sale, his purchase amounted under familiar principles of law to a redemption in favor of his sisters and their heirs." I readily agree that this is established law under most factual situations. It is commonplace in landlord and tenant cases (such as the *Slinkard* case, supra), and tax redemption cases wherein the close, sensitive, fiduciary relationship is shown. In both the *Slinkard* and *Lewis* cases, supra, relied upon by the majority, a party to the relationship promptly protested to violation of it, and clearly established a fiduciary, sensitive, trust relationship. Having so established the relationship, then the violation thereof was clearly a redemption. The *Lewis* case, supra, was decided upon the theory of a constructive trust, as well as upon the after-acquired title statute. It refers to "the necessary element of that unconscientious conduct which equity calls constructive fraud." It is this element that appears to me to be completely missing from the facts here involved.

Here the parties to the alleged relationship, over a span of 39 years, have made no protest whatsoever of any so-called "unconscientious conduct." It seems to me that the majority opinion overlooks this, simply holding that upon establishing an assumption of the indebtedness, a default, and a repurchase, irrespective of all other facts, as a matter of law the repurchase is an equitable redemption. I cannot agree because of the factual situation in this record. The conduct of the parties themselves, followed for 57 years, seems to me to establish a complete absence of any unconscientious conduct.

I concur that the consideration (but not necessarily the sole consideration) for the 1920 deed was an assumption by Gus of the McKissack indebtedness. I do not agree, however, that this fact supports the indispensable finding that a family agreement was necessarily made, between Gus on the one hand and Maude, Carrie and Omie on the other, which created a fiduciary, a sensitive, a trust relationship which

converted the 1928 deed from McKissack to Gus into an equitable redemption. Appellants' position is squarely based upon such a finding. The majority assumes that Gus agreed to pay the indebtedness in order *to preserve the property for the benefit of Carrie's and Omie's heirs*. Absent such a relationship, the doctrine of equitable, redemption has no application.

The complaint filed in the old foreclosure proceedings indicates that other factors were involved. It states that an agreement was made with Gus, "in writing," to assume this obligation. The 1920 deed makes no mention of any obligation to assume the indebtedness. It is the only "writing" between those parties. Thus it seems fair to assume that the "in writing" obligation was with McKissack, and the decree renders personal judgment in favor of McKissack against Gus. The foreclosure decree recites: "All defendants herein deeded their interest in the aforesaid land to Gus Lecroy, one of the defendants, for the consideration, among other things, that he assume the payment of the aforesaid note, *which by agreement of all parties to this suit he did assume.*"

Note the language, "by agreement of all parties." This, of course, includes McKissack. The indebtedness was due in 1919, and the deed to Gus was dated in 1920. Thus, the indebtedness was then delinquent, and McKissack had the right to immediately foreclose. Certainly McKissack had no interest in obligating Gus to assume the obligation *in order to protect the title for the benefit of Carrie's and Omie's heirs*. It is much more logical to assume that McKissack imposed the assumption agreement for his own betterment and that the Lecroys felt required to agree in order to avoid immediate foreclosure. This would explain why, when the inevitable foreclosure did occur, with Maude, Omie and Carrie parties thereto, that Omie and Carrie made no protest and reflected no outrage for the remainder of their lives because of Gus' reacquisition of the property ten months later.

Maude, Carrie and Omie were all parties to the foreclosure proceedings. They filed no answer and introduced no proof whatsoever, yet McKissack was fully aware of the assumption by Gus. It is most logical, therefore, to me, to find that Gus' agreement to assume was made to McKissack to

avoid the immediate loss of the land by foreclosure. The indebtedness secured by the Deed of Trust was, as aforesaid, due January 10, 1919. The Deed of Trust was not foreclosed until 1928.

From this record I cannot read into it any ruse or device exercised by Gus to permit the lands to be foreclosed to defeat the limitations in the deed. I think it is clearly and irrefutably established by the acts and conduct of the parties to the so-called family agreement that there was no understanding that Gus would assume the indebtedness for the purpose of protecting the land for the benefit of Omie's and Carrie's heirs. The so-called equitable redemption — the McKissack deed to Gus — occurred in 1928. The deed was absolute on its face, was dated August 22, 1929, and recorded August 26, 1929. Thereafter, as is alleged in the plaintiffs' complaint, "Gus Lecroy and Mattie Lecroy executed and delivered to these defendants (16 in number), or their predecessors in title (the record does not reflect how many), deeds purporting to convey some interest in the above described land." Various mortgages or deeds of trust have been executed upon the property, purporting to convey and encumber an absolute interest therein. The holders of three current mortgages are parties defendant to this action. It also appears that there are outstanding Oil and Gas Leases, since the prayer of the complaint seeks a decree impounding the proceeds of oil, gas and other minerals produced from these lands. In short, Gus Lecroy exercised absolute, overt, full and complete ownership of these lands from 1929 until the date of his death in 1972. Moreover, his widow still lives, and until 1976 no protest was made of her absolute ownership. During all of these years the title to this land was vested in Gus and Mattie, as husband and wife. None were heard to protest that, on the event of Gus' death prior to Mattie's death, she would become the sole record owner of the property.

Omie died July 4, 1945. Thus, for 16 years she observed her brother and his wife exercising such acts of ownership, and she made no protest. Carrie died July 1, 1967. She, likewise, observed this "unconscientious conduct" for 38 years, without protest. I am not unmindful of the fact that Carrie and Omie had conveyed their interest in these lands to

Gus and that the ultimate owners thereof had no present right to bring a *possessory action*. Carrie and Omie did, however, have the right to institute a proceeding to declare and establish this to be an equitable redemption, a violation of the trust agreement to which they allegedly were parties. Yet they did nothing. To me, this is most persuasive, if not conclusive, evidence of the fact that they did not consider Gus' reacquisition of the property, following the proceedings, a violation of any family agreement. Both Omie and Carrie, as aforesaid, were parties to the foreclosure and they are charged with knowledge that it purported to completely destroy any interest which they, their heirs or assigns, might have in these properties. They are equally charged with knowledge that Gus reacquired the property free and clear of any "family" obligation. His deed, on its face, purported to be in direct and specific violation of the agreement, if such agreement existed. Carrie and Omie observed the creation of interests in this property in favor of innumerable third parties (16 of whom are presently owners and defendants herein), which interests were directly and diametrically opposed to those of Omie's and Carrie's "heirs." Yet they remained silent. To me, this silence speaks most eloquently in establishing that there was no family agreement. It seems quite obvious to me that such agreement was conceived and found its being by the discovery of oil on the property in 1976. In the absence of such discovery, the course of conduct previously pursued by all of the parties would have continued indefinitely, everyone being quite content with Gus' and Mattie's absolute ownership of the property.

I would affirm the Chancellor's denial of the plaintiffs' Motion for Summary Judgment and his action in granting the defendants' Motion for Summary Judgment, agreeing with him that the record fails to establish any family agreement as asserted by the plaintiffs.

I am authorized to state that Justices BYRD and HICKMAN concur in this dissent.