MRS. DORA LOUISE PARISH AND THOMAS L. PARISH, ... HER HUSBAND *v.* OLLIE W. PITTS AND THE CITY OF LITTLE ROCK

5-4134                                   429 S. W. 2d 45

Opinion delivered June 3, 1968
[Rehearing denied July 15, 1968.]

*Alonzo D. Camp*, for appellants.

*Joseph C. Kemp*, City Attorney; *John B. Plegge*, Asst. City Attorney, for appellees.

*Warner, Warner, Ragon & Smith; Henry Woods* and *Dale Price; Terral, Rawlings, Matthews & Purtle; Spitzberg, Bonner, Mitchell & Hays; F. N. Burke Jr., Roscopf & Raff, David Solomon, John L. Anderson, Oscar Fendler, Rieves & Rieves; Frierson, Walker & Snell-*

*grove; Glenn G. Zimmerman, William G. Fleming* and *W. H. Dillahunty,* amici curiae.

WM. M. MOORHEAD, Special Justice. This Court is again asked to overturn the rule of law granting to municipalities immunity from liability for damages negligently inflicted on others while acting in a governmental capacity.

Appellants sued the City of Little Rock and one of its employees for damages as compensation for painful and permanent bodily injuries allegedly suffered by Mrs. Parish when her car was negligently struck by the City's garbage truck. The judgment of the lower court sustained the demurrer of the City and dismissed the complaint against it. Plaintiffs appealed.

The Court below followed the precedents of this Court which have established that a municipality when acting in its governmental capacity is not liable in damages for injuries inflicted on others by the negligent acts of its employees, servants and officers. If the activity causing the harm was "in the interest of the public generally", it is classed "governmental" and no suit will lie against the municipality. Clearly the operation of a garbage truck is governmental by this test. *Kirksey* v. *City of Fort Smith,* 227 Ark. 630, 300 S. W. 2d 257 (1957). Yet, in applying this rule the Court there voiced its criticism: "Considerations of fair play and justice suggest that those injured by the negligence of a municipality or its agents should be compensated on equal terms with those injured by individuals or private corporations." The opinion further noted that many students of law have so recommended, that the Arkansas Legislature in 1947 had authorized municipalities to purchase liability insurance with a right of direct action against the insurer and expressed the hope that the Legislature might make the purchase of such insurance by municipalities mandatory at some future time. However, the Court felt that even though it might agree that the

present rule of municipal immunity from tort actions should be replaced with a stricter, more complete rule of responsibility, it was a matter of public policy and therefore, for consideration of the Legislature, not the Court. *Kirksey* v. *City of Fort Smith, supra*. The Legislature's broad investigative powers to determine facts and its greater flexibility in dealing with complex problems indicate a preference for a solution by statutory action. Despite the Court's invitation for legislative action ten years ago there has quite understandably been no comprehensive legislative consideration, or action on this troublesome question. It could not realistically be expected that a problem of judge-made or "lawyers' law" could or would be given the necessary time and attention by the Legislature. It operates basically in a sixty-day biennial session, necessarily crowded with more pressing and immediate problems of economics, taxation, the allocation of the proceeds thereof, and the myriad other interests affecting the general welfare of the people of the State. It should also be realized that most citizens, and more particularly legislators, will normally think of themselves as being on the side of government rather than opposed to it. They are thus more likely to cling to the "pleasant and appealing advantage" of immunity from liability for injury suffered at the hands of their public servants and employees. *Leflar and Kantrowitz*, "Tort Liability of the States", 29 N.Y.U.L. Rev. 1363 (1954). Although the field of the common law is not primarily the Legislature's problem, it is the primary concern of this Court. Accordingly, the Court, not the Legislature, should extirpate those rules of decision which are admittedly unjust, for it is to the judiciary that the power of government is given to provide protection against individual hurt. Green, *Freedom of Litigation,* 38 Ill. L. Rev. 355, 382 (1944).

Considerations of public policy are not and never have been for determination by the Legislature alone. Holmes, The Common Law, 35 (1881). Especially is this so when the individual's rights are put in question by

governmental activity as here. We are now of the opinion that re-examination of the principle of governmental immunity from tort action is the duty of this Court and should be undertaken at this time.

The origin of the concept of governmental immunity to suit and how it came to relieve the municipal corporation in the United States of liability for its tortious conduct, is quite involved and the subject of conflicting accounts. Nevertheless, it is generally agreed that its application to a local unit of government is first recorded in *Russel* v. *Men of Devon*, 2 T. R. 667, 11 Eng. Rep. 359 (1788). An action for injuries caused by a defective bridge was brought against all the men of the County of Devon since they were required by statute to keep it in repair. Even the reasons given in the report for denial of the right to sue are subject to much dispute today. It was said a multiplicity of suits would be encouraged; that no such action had been authorized by statute; and that a judgment would work an injustice upon the changing population of an unincorporated county since those not residents when the tort occurred could be required to help satisfy it. In the concurring opinion is found what may well be the most fundamental reason for the concept:

"It is better that an individual should sustain an injury than that the public should suffer an inconvenience".

The earliest Arkansas case enunciating the rule, *Granger* v. *Pulaski County*, 26 Ark. 37 (1870), cited the Massachusetts case of *Mower* v. *The Inhabitants of Leicester*, 9 Mass. 247, which in turn had cited the *Russel* case, *supra*. It is noteworthy that in applying this concept to a county the Arkansas court pointed out the distinctions between the unincorporated county and the incorporated municipality, indicating that liability might well attach to the latter. In *City of Little Rock* v. *Willis*, 27 Ark. 572 (1872), it was said that for the exercise

of judgment and discretion by the municipality for the good of the whole, no action would lie for injuries resulting therefrom, but that for the negligent performance or execution of the orders of such a public body, suit would lie. This reasoning was followed in *Mayor of Helena et al* v. *Thompson,* 29 Ark. 569 (1874), and liability was imposed upon the City for the negligent construction of an inadequate ditch and culvert which served to divert a flowing stream.

Yet, in *Trammel* v. *Town of Russellville,* 34 Ark. 105 (1897), without mentioning the *Willis* and *Thompson* cases, *supra,* this Court held that a municipality is liable in tort only if the activity engaged in was solely for financial gain or "proprietary" in nature, but if the activity causing the injury was in the interest of the public generally, it is "governmental" and the city is immune to suit and liability. In 1931, in *City of Little Rock* v. *Holland,* 184 Ark. 381, 42 S. W. 2d 383, the decisions in this field were reviewed, the oversight of the *Willis* and *Thompson* cases, *supra,* in the *Trammell* decision, *supra,* was noted. Still the Court concluded that a municipality is not liable for its nonfeasance, nor for the negligence of its officers and agents in the performance of a governmental function. Thus by implication the earlier Arkansas cases imposing liability on municipalities for negligence in the performance of ministerial acts were overruled. This rule has been followed to the present with little discussion until the opinion given in *Kirksey* v. *City of Fort Smith, supra.* In applying the governmental-proprietary test, Arkansas has held that the maintenance of city streets, *Risser* v. *City of Little Rock,* 225 Ark. 318, 281 S. W. 2d 949 (1955); law enforcement activity, *Franks* v. *Town of Holly Grove,* 93 Ark. 250, 24 S. W. 514 (1910); the operation of municipal waterworks, *Patterson* v. *City of Little Rock,* 202 Ark. 189, 149 S. W. 2d 562 (1941); operation of an electrical distribution system, *City of Little Rock* v. *Holland, supra;* and the maintenance of a municipal swimming pool, *Yoes* v. *City of Fort Smith,* 207

Ark. 694, 182 S. W. 2d 683 (1944), are governmental functions. No case of liability for personal injury by a municipality is found in the Arkansas reports. In Arkansas, the immunity of the municipality in the tort field is, in practice, complete at present.

The only mitigation of the rule of governmental immunity in Arkansas has come in the past by legislative action. In 1940 this Court determined that a rural electrical cooperative should be immune from tort liability. *Arkansas Valley Cooperative Rural Electric Company* v. *Elkins*, 200 Ark. 883, 141 S. W. 2d 538 (1940). The reasons given were those applied to the governmental activities of a municipal corporation: the cooperative was not organized for profit, but only for the benefit of its members; it has no fund provided by statute out of which to pay judgments; rather, its funds were said to be held in trust, available only for its corporate purposes. Six years later the Legislature reversed that decision of the Court by providing that such organizations should be liable for torts resulting from the negligent acts of its agents, servants and employees. Act 362 of 1947; Ark. Stat. Ann. § 64-1525 (Repl. 1966).

This same General Assembly, by Act 46 of 1947, authorized municipalities and other entities enjoying the rule of immunity to purchase liability insurance covering their tort damages. The sovereign State of Arkansas itself has submitted to a forum in which its tort liability is determined and compensation paid to the injured parties. See Ark. Stat. Ann. § 13-1401 ff. (Repl. 1956), establishing and providing a mode of proceeding before the State Claims Commission. State employees have rights similar to those given private employees by the Workmen's Compensation laws of this State. Ark. Stat. Ann. § 13-1407 ff. (Repl. 1960). Thus we see that the basic injustice of the rule of tort immunity where it has come to the attention of the Legislature has met with dissatisfaction and been curtailed in part. This same "abhorrence of wrong suffered without a forum

in which redress may be had'', is reflected in similar and more far-reaching legislation of other states and of the United States Government. See Leflar and Kantrowitz, *Tort Liability of the States,* 29 N.Y.U.L. Rev. 1363 (1954); Vermont Laws 1961, Public Act No. 265, Title 12, sec. 5601-02; Washington, Rev. Code, Ch. 4192; R.C.W. 4.92.090, added 1963 Ch. 159, sec. 2; Alask. Stats. Title 9, Ch. 65, sec. 09.65-070 added to a sec. 5.13 Ch. 101 S.L.A., 1962, and the Federal Tort Claims Act, 28 U.S.C.A., 2674 (1948). We do not construe such limited legislative action as has been taken in Arkansas to soften the impact of immunity on individual rights as an expression of legislative intent to retain the rule in all other areas. Only a comprehensive legislative study and enactment encompassing the entire field would warrant such an inference.

Legal scholars for the past forty years have criticized and condemned the concept of governmental immunity. An early and thorough-going examination of the doctrine was by Borchard, *Government Liability in Tort* (Pts. 1-3), 34 Yale L. J. 1, 129, 229 (1924-25); *Government Liability in Tort* (Pts. 4-6), 36 Yale L. J. 1, 757, 1039 (1926-1927); 28 Colo. L. Rev. 577, 734.

One of the more exhaustive examinations concludes that the failure to break fully with the immunity rule and ''... to do what nearly everyone agrees ought to be done...'' is found in three basic factors: First, the language of sovereignty found in the early cases; second, legislative and judicial inertia, thought to be the most potent single explanation of inaction; and finally, the fear that the financial burden of liability would result in inability to perform essential governmental services. Leflar and Kantrowitz, *Tort Liability of the States,* 29 N.Y.U.L. Rev. 1363 (1954).

Tort law is intended to reconcile the policy of letting accidents lie where they fall, thereby giving reasonable freedom of action to others, and protection of

the individual from injury which the defendant had a reasonable opportunity to avoid at the time. Holmes, The Common Law, 144 (1881). The "reasonable freedom of action" here in question is that of a municipality, furnishing essential and other services to the public. The rule of immunity frees these activities of the city from liability for damages inflicted upon the individual. It is the tort-victim who bears the entire, sometimes calamitous, burden resulting from these enterprises undertaken for the benefit of the entire community. The considered conclusion of the legal commentators has been that this burden should be treated as any other cost of administration of municipal activity and thereby be spread by taxes among the public receiving the benefits. Municipal irresponsibility and the sacrifice of individual rights to public convenience are not required to forestall disaster to the municipality.

They have pointed out that although municipalities are political subdivisions, created by the State and performing some governmental functions, they are not the State and do not partake of its sovereignty; they are corporate bodies, capable of much the same acts as private corporations; they have special and local interests and relations not identified with the State at large. They engage in fields of activity as a service to the citizenry never dreamed of in 1788, when this doctrine was first set forth in the report of the *Men of Devon, supra,* nor in 1870, when it was made a part of the law of Arkansas. The assumption of new and expansion of old services by the city for the benefit of the public has so augmented the incidence of this unjust precept on individual rights that it can no longer be retained except for the most compelling reasons. It has been noted that once the doctrine was imposed and followed by the courts *stare decisis* insulated the high court from the magnitude of the wrong being wrought by its application. Furthermore, the victims being individuals, made up at random from among the public generally, have, in the nature of things, no voice in the legislative halls.

Thus neither the judicial nor the legislative processes have been brought to bear on the problem.

The supposed threat to the cities' operations posed by financial responsibility for its torts has ever been a major factor, though not always expressly set forth, upholding the immunity rule. This fear is found in the report of the decision in *Men of Devon, supra,* wherein it was expressed as "inconvenience to the entire populus", and in *Arkansas Valley Cooperative Rural Electric Company, supra,* holding later that all funds were subject to a trust for the benefit of the members and to divert them to the satisfaction of tort judgments would be a violation of that trust. However, it is the conclusion of those studies that the fear of curtailment of essential public services or the imposition of tremendous financial burdens on the public, is not founded on fact. In the private sector tort liability is a small item in the budget of any well run enterprise and should prove to be proportionately no greater for the municipality, since it will have available to it the same defenses and means of spreading the risk. 9 Law and Contemporary Problems (1942); Warp, Tort Liability Problems of Small Municipalities, 363; David, Public Tort Liability Administration; Basic Conflicts and Problems, 335; David, Tort Liability of Local Governments: Alternatives to Immunity From Liability, 6 U.C.L.A.L. Rev. 1 (1959); Green, Freedom of Litigation, 38 Ill. L. R. 355. At page 367 of this last work this judicial fear is contrasted with experience; in *Wilcox* v. *Chicago,* 107 Ill. 334, 340 (1833), it was said that to subject cities to liability for the operation of a fire department ". . . would most certainly subject property holders to as great, if not greater burdens than are suffered from the damages from fire." Yet, the Illinois Legislature in 1931 imposed liability on the cities for injuries to person and property caused by the negligence of the employees of the fire department. It was thirteen years before a case appeared in the Illinois Reports in which damages had been assessed against a city under this statute. Arkan-

sas's own limited experience with the imposition of tort liability on cooperatives apparently has not resulted in a rash of cases nor oppressive financial burdens on that type of public corporation. The excellent *amicus curiae* brief filed herein by the Arkansas Municipal League quotes at length from reports over the last several years by the New York Legislature's Joint Committee on Municipal Tort Liability. In 1929 the State of New York waived its immunity from tort liability by statute and in 1945 its courts construed this to be applicable to municipalities and counties. Yet those reports give no instance of curtailment or deprivation of essential municipal service. Quite expectedly this legislative committee is concerned with the extent of tort claims, the rising cost of liability insurance and in some instances difficulty in obtaining such insurance. New York's experience with municipal tort responsibility would rather seem to indicate that the cities can continue to function while responding in tort to those injured by their activities. No one has ever suggested that it will not add to the financial problems of the municipalities. Anything short of financial disaster, however, is insufficient reason for exempting the cities from the rule of tort liability. In any case, the solution of the financial problem by taxation or otherwise rests with the legislative branches of government, not the judicial. If the rule of liability imposes on the taxpayer either a curtailment of some municipal services or an increase in his taxes, still it will serve to assure him that the economic impact of any tortious injury he may suffer at the hands of a public employee would be shared with the other inhabitants of the city rather than, "... falling with awesome tragedy" upon him alone. *Williams* v. *City of Detroit*, 364 Mich. 231, 111 N. W. 2d 1, 25 (1961). Admittedly, this court, because of the limitations on the judicial function, is not able to conduct the careful survey, preparation and study required for an ideal solution to the problem of municipal irresponsibility, nor can it limit and moderate the imposition of liability as could the legislature. Yet, if it is not con-

clusively shown that the cities can bear the financial burden of their own torts, neither is it demonstrated that they are unable to do so. An exemption of this magnitude to the usual rule of law leading to a just result in tort can no longer be continued because of speculative fears by the Court of financial disaster to cities. The injustice wrought by the immunity rule on the individual's rights is clear and certain; its justification must be no less so.

Beginning with Florida in the year 1957, ten American jurisdictions have reviewed and rejected the doctrine of governmental immunity for political subdivisions and entities, *Hargrove* v. *Town of Cocoa Beach, Fla.,* 96 So. 2d 130 (1957); *Molitof* v. *Kaneland Community Unit District,* 18 Ill. 2d 11, 163 N. E. 2d 89 (1959); *McAndrew* v. *Mularchuk,* 33 N. J. 172, 162 Atl. 2d 820 (1960) (active wrong-doing only); *Muskopf* v. *Corning Hospital District,* 55 Cal. 2d 211, 359 Pac. 2d 457 (1961); *Williams* v. *City of Detroit,* 364 Mich. 231, 111 N. W. 2d 1 (1957); *Holytz* v. *City of Milwaukee,* 17 Wis. 2d 26, 115 N. W. 2d 618 (1962); *Spanel* v. *Mounds View School District,* 264 Minn. 279, 118 N. W. 2d 795 (1962); *Fairbanks* v. *Schiable,* Alaska, 375 Pac. 2d 201 (1962) (interpreting statute permitting suit against local government unit and refused to apply "proprietary-governmental" test); *Rice* v. *Clark County,* 79 Nev. 253, 382 Pac. 2d 605 (1963); *Haney* v. *City of Lexington, Ky.* 386 S. W. 2d 738 (1964).

Of sovereignty as a reason for holding political subdivisions immune to suit, it is generally agreed in those decisions that cities and other such entities are not the state, and it is only to the state that the high attribute of sovereign immunity should properly be attributed. Generally governmental immunity is traced to the medieval concept that "the king can do no wrong", a notion which is entirely foreign to and at variance with the basic principles of government in America. Whether the rule of governmental immunity is traceable to the medieval concept that "the king can do no wrong" or

to the *Men of Devon* case, *supra*, which does not mention today. Further, the reasons given in the *Men of* of kings to govern, political subdivisions are not in fact the sovereign state. The language of the early decisions concerning sovereignty has little bearing on the question today. Further, the reasons given in the *Men of Devon* case, *supra*, if valid when adopted, are no longer sufficient to justify the rule of immunity. Public convenience does not outweigh the right to individual compensation for injuries suffered, and the political subdivisions are corporate entities financially capable of providing for the satisfaction of such judgments. *Muskopf* v. *Corning Hospital District, supra*. In *Hargrove* v. *Town of Cocoa Beach, supra*, it is said:

"The modern city is in substantial measure a large business institution. While it enjoys many of the basic powers of government, it nonetheless is an incorporated organization which exercises those powers primarily for the benefit of the people within the municipal limits who enjoy the services rendered pursuant to the powers. To continue to endow this type of organization with sovereign divinity appears to us to predicate the law of the Twentieth century upon an Eighteenth century anachronism. Judicial consistency loses its virtue when it is degraded by the vice of injustice." In the *Molitor* opinion, *supra,* as in others above cited, it is noted that this doctrine of immunity was created by the courts, not the legislatures, and that the courts should correct their own errors, and so concluded that the rule was, "... unjust, unsupported by any valid reason, and has no rightful place in modern day society."

Of the fear of bankrupting the political subdivision by imposing liability these several courts note the fact that no such actual case has been pointed out, *Spanel* v. *Mounds View School District, supra*; that public liability insurance was not in common use at the time the courts of this country adopted the doctrine of governmental immunity, while today it "... serves private citizens and private corporations as a means of prepaying

and sharing this sort of unexpected burden with which we deal in this case''. *Williams* v. *City of Detriot, supra.* All give weight to the growth of municipal activity.

Municipalities are not the State of Arkansas and do not partake of its constitutionally granted immunity. It does not clearly appear to us that in this day and time the municipality and those presumably benefiting from its services are unable to bear the full cost of these activities. The immunity rule imposing the entire burden of municipal torts on the individual victims is patently unjust and can no longer be retained without an equally clear showing of an even greater harm to the public.

Other courts during the past ten years have, like Arkansas in *Kirksey, supra,* refused to overturn the rule of governmental immunity, though many have criticized it. Their principal reason for continuing to adhere to an admittedly unjust rule is the doctrine of stare decisis. This policy of adhering to precedent to give predictability to the law, and to avoid unsettling things, is fundamental to the common law. So too is the power to overrule a line of decisions, even those under which property rights were acquired. *Carter Oil Co.* v. *Weil,* 209 Ark. 653, 192 S. W. 2d 215 (1946). Precedent governs until it gives a result so patently wrong, so manifestly unjust, that a break becomes unavoidable. Any rule of law not leading to the right result calls for rethinking and perhaps redoing. *Llewellyn,* Jurisprudence, 217 (1962). The proper limitations on the doctrine of *stare decisis* have ever been recognized by this Court. ''Precedent, it is said, should not implicitly govern, but discretely guide . . .'', *Roane* v. *Hinton,* 6 Ark. 525, 527 (1846). Having determined as we have here that a rule established by precedent no longer gives a just result it must then be determined whether the rights of those who have justifiably relied upon the established precedents are of greater weight in this case than that the rule be corrected. The test is whether it is more important that the matter remain settled than that it be

settled correctly. *Brickhouse* v. *Hill,* 167 Ark. 513, 522, 268 S. W. 865 (1925). We are not here faced with a rule of property, for the law of torts does not affect ownership or devolution of title. Contracts and wills are not drawn in reliance upon it. Ordinarily then the doctrine of *stare decisis* is of no great weight in the field of tort law. Here, however, a numerous class, the municipalities, relying on the past decisions of this Court granting them immunity, may well have neglected to investigate accidents or to insure against liability as they are permitted by statute to do. Hence, because of this Court's prior rulings, many would be unprepared to present defenses otherwise available to them, and in event of the imposition of liability, a small municipality might find itself financially unable to meet it without the possibility of disrupting its services to the public.

That possible hardship on those who have justifiably relied upon the law as announced by the Court in the past stems from the retroactive effect normally given a court decision. Legislative acts which normally operate only in the future avoid this effect. It is for this reason that many of the courts have left such problems for legislative solution. *Whittington* v. *Flint,* 43 Ark. 504 (1884). In the past we have met the problem by making our decisions operative only in the future. *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S. W. 2d 973 (1952). Other courts faced with this problem arising from elimination of past error have solved it in all three ways open to us: California in the *Muskopf* case applied the decision in the normal manner; making it retroactive as to the present case and all other actions arising within the statute of limitations. The Legislature fixed a period during which the new rule would be held in abeyance. Cal. Stat. ch. 1404. In *Williams* v. *City of Detroit, supra,* the Michigan court held that governmental immunity no longer would be recognized from the date that decision, while in *Holytz* v. *City of Milwaukee, supra,* Wisconsin allowed suit by the plaintiff before it, but

made the new rule applicable to others only in the future. This last mode of procedure seems to us to best meet the several inevitable problems created by a change in a line of precedents. We declare the rule of liability to be applicable to this case and all other causes of action arising after this decision becomes final. This serves, in keeping with our system of the private enforcement of legal rights, to reward the present plaintiff for her industry, expense and effort, and for having given to this Court the opportunity to rid the body of our law of this unjust rule. The impact of retroactive application on the present defendant is not likely to create any major crisis. Being prospective as to all other causes of action the municipalities are given time in which to procure insurance and take measures to protect themselves in suits thereafter arising. Any one of the three means of application of the law here is necessarily going to deny the benefit of this decision to some injured persons. This is always true when there is any change, judicial or legislative, in the law.

We would make plain that this decision imposes liability on municipalities only for the imperfect, negligent, unskillful execution of a thing ordained to be done. No tort action will lie against them for those acts involving judgment and discretion; which are judicial and legislative or quasi-judicial and quasi-legislative in nature. The exercise of discretion necessarily carries with it the right to be wrong. It is only for ordinary torts committed in the execution of the activities decided upon that a tort action will lie; not for the decision itself.

Nor have we at this time considered the liability of any other governmental unit or political subdivision.

Judgment reversed.

Jones, J., disqualified.

George Rose Smith, J., concurs.

Harris C. J., and Fogleman, dissent.

GEORGE ROSE SMITH, Justice, concurring. I join in Special Justice Moorhead's opinion, but I should like to add a word in reply to the dissentient suggestion that our statute adopting the common law of England exempted that body of rules from judicial modification, leaving the power of repeal in the legislature alone. If that were true we would be absolutely bound to follow an English precedent announced 300 years ago, no matter how wrong we thought it to be, if no later case on the point could be found. The practical point of view, and I think the right one, is that when we adopted the English common law there was included in that heritage the fundamental common law rule that a court can and should overrule an erroneous judicial decision when it can be done without injustice to past or future litigants. That is all the court is doing today.

CARLETON HARRIS, Chief Justice, dissenting. I have no quarrel with the basic premise set out in the majority opinion, *i. e.*, that from the standpoint of right and wrong, it is just as right for a person who is hurt by the negligence of a city and its employees to obtain damages for the injury, as it is for those persons who are injured by the negligence of private individuals or corporations. But I think there are compelling reasons why the doctrine of governmental immunity should not be changed by this court.

Of course, this immunity was a part of the common law when this state was admitted to the Union. The very first section that appears in our Arkansas statutes (numbering 20 volumes), Ark. Stat. Ann. § 1-101 (Repl. 1956), provides that the common law of England, of a general nature, and not inconsistent with the constitution and laws of this nation, or this state, "shall be the rule of decision in this state *unless altered or repealed by the General Assembly of this state.* [My emphasis.]" Actually, as is pointed out in *Horsley* v. *Hilburn*, 44 Ark. 458 (1884), while Arkansas was still a part of the Missouri Territory, this statute (in

substance) was enacted (1816), and the opinion then recites:

"This statute remained to govern the subsequent formed territory of Arkansas, and was afterwards reenacted as a part of the laws of the State, with some change of phraseology and grammatical arrangements."

Throughout all the sessions of the General Assembly subsequent to our admission as a state (1836), there apparently has been no attempt to enact legislation to change the long-standing doctrine of governmental immunity to suits in tort, and I can see no urgent reason for this established policy to be changed by judicial fiat. As pointed out in the majority opinion, the only modification of the rule came by virtue of legislative action in 1940,[1] and the subject was also indirectly approached in 1947, when the Legislature authorized municipalities to purchase liability insurance covering tort damages. It is significant to me that the General Assembly has not made further exceptions to the general rule, and to me, it is somewhat persuasive that legislative intent has been expressed to retain the rule.

There are many facets connected with a change of the rule that are unanswered. For instance, the immunity is not being done away with in personal injury cases alone, but this step also relates to acts committed that damage property, or conversely, the failure to perform acts that might have prevented damage to property (or person). The failure of building inspectors to discover and eliminate certain hazardous conditions, or perhaps the failure of the city to install a traffic light at some location, which a jury might find to have been hazardous, are examples of possible liability. Actually, there are literally dozens of situations that could arise.

---

[1]After this court had held that a rural electric cooperative should be immune from tort liability, the General Assembly enacted legislation providing that these organizations were liable for torts resulting from the negligent acts of agents, servants and employees.

It is pointed out by the majority that cities and towns can obtain liability insurance—but I am not convinced that this is true in every instance. Not only that, but what would be the cost of such insurance? I cannot say—but I do know that the premiums for automobile coverage are constantly increasing; in fact, a recent increase on this type of coverage was granted which will average 17% over the state. I have no doubt but that similar increases will be sought for public liability coverage. It may well be that many cities and towns will not be able to afford adequate coverage, and I know of no way for this deficiency to be corrected, except by additional taxation. Here again, it may well be necessary for the General Assembly to pass legislation affording proper authorization for the cities to act. But suppose the General Assembly does not act—where then, is the answer? The plight of the cities, though giving me concern, does not disturb me as much as the possible plight of small towns. The judgments awarded today by juries are far larger than those of past years, and, under some causes of action, the financial structure of a small town could be literally "wiped out" by one large judgment.

The needs of a city are many, and most police and fire departments are undermanned and underpaid; the demand for all types of services becomes greater each year, and I cannot bring myself to impose this additional burden.

I reiterate that this is a matter for the General Assembly. Perhaps, at the beginning, the court could have justifiably taken the step that is now being taken, but the fact that the rule of governmental immunity has been in effect in this state (and territory) for 150 years, strengthens my conviction that no change should be made, except through legislative action.

I respectfully dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I subscribe

to and join in the dissenting opinion of the Chief Justice. This court has on numerous occasions, some rather recently, said that the question presented here was one for consideration by the legislative branch of the government. I still feel that the court was right, and I cannot see that anything has changed except some of the personnel of this court. If the times and current circumstances call for a change in public policy in this field, it should be done by the General Assembly which is properly a policy-making branch of government.

In *Kirksey* v. *City of Fort Smith,* 227 Ark. 630, 300 S. W. 2d 257, this court, in addition to the quotation in the majority opinion, said:

> "If we were privileged to set the state's public policy on this issue we might readily agree that the present pattern of partial tort liability of municipalities should be replaced with a stricter or more complete rule of responsibility. * * * Able law writers have so recommended, but through legislative and not judicial action. See the splendid article on 'Municipal Tort Liability in Operation,' 54 Harvard Law Review 437. A step in this direction was taken by the Arkansas Legislature in 1947 by the enactment of Ark. Stats., § 66-517 et seq., which authorizes municipalities and other agencies immune from tort action to purchase liability insurance with the right of direct action by the injured plaintiff against the insurer. Perhaps the Legislature will make the purchase of such insurance mandatory at some future time. This decision rests with the people acting directly or through their legislature, and not with the courts."

While the doctrine of municipal tort immunity may not have been based upon the constitutional immunity of the state from suit, a city is nevertheless an agency of the state for the performance of specified essential governmental functions in a limited area. The fact that

a city can be sued at all has never seemed to me compatible with the holding that agencies of state government, such as the Arkansas Highway Department, cannot be sued. Cities do exercise some of the sovereignty of the state. If they do not, how can some of their powers, such as prosecutions for violations of ordinances, be constitutionally justified?

If the problem is approached from the point of view that our cities have become business institutions in many respects, a workable solution could be found in the liability of cities when acting in a proprietary, rather than a governmental, capacity without opening the door to a floodgate of unanswered questions for these agencies of state government which have become so important in our scheme of things that in recent years an executive department of our federal government has been created to deal with their problems at that level.

We should not assume that the General Assembly has been unaware of our decisions or the expressions in our opinions that this court thought some legislative action was appropriate. That branch of our government is usually alert in giving attention to matters when changes in our basic law is needed. No better examples can be found than in the actions eliminating tort immunity of electric cooperatives, authorizing the purchase of liability insurance by agencies to which tort immunity has been extended, and creating the State Claims Commission.

Had a study in depth of this problem by the legislative branch been felt appropriate by the General Assembly, there can be no doubt that it would have been undertaken either through the Legislative Council or by other means. The creation of the Arkansas Constitutional Revision Study Commission, the Arkansas Economic Expansion Study Commission, and the Arkansas Judiciary Commission are evidences of their alertness.

This action cannot be properly justified by any allegations of affluence on the part of municipalities. While revenues are greatly increased over those of 1870, the number and extent of the services demanded of them have multiplied at a much more rapid pace than have the revenues and sources thereof. Evidence should not be required for us to know that cities in Arkansas bring ever increasing financial problems to the General Assembly biennially and that cities all over the nation are calling upon the National Congress for aid. Strict limitations on the taxing power of municipalities, whether wise or unwise, make this new liability a greater problem than should be imposed without some compensating means which can only be provided legislatively.

There is a delicate balance of powers in our three separate and independent branches of government. None of them should be more alert to preserve that balance and recognize the independence of each of the interrelated branches in its own field than the judicial department. I deplore the growing tendency on the part of courts to take actions which might well be construed to give the impression that the judiciary may, in pointing out what it deems to be matters requiring legislative attention, be saying: "If you don't, we will." The step being taken here is one of the few actions of this court that might be so construed. We should not impose a whole new batch of problems on the legislative branch by a judicial solution of a problem that we have repeatedly said belonged to it.

I am not entirely satisfied that insurance is actually available for the various liabilities that would be imposed upon cities by today's decision or if now available, that it will continue to be. Even if it is, what are to be the limits of liability? Tort injuries to a whole family in an automobile in one of the smaller incorporated towns, such as Jerome, would justify as much money damage as they would in Little Rock. Many of these small incorporated towns will not have the reve-

nues sufficient to pay liability insurance premiums after paying for the services required of them. None of our municipal corporations can afford to pay their employees adequate salaries, even without this additional burden.

I cannot help posing unanswered questions which make me steadfast in my opinion that the matter of change should have been left to the legislature rather than to this court.

Should there be limits of liability? If so, should they be the same for all municipalities or should they bear some relationship to population or assessed valuation?

Should the rule have been applied to all municipalities, or just to cities, not incorporated towns, or just to cities of the first class?

Should the liabilities and damages be determined in the courts just as is done in the case of a private corporation? Should a procedure similar to that under the Federal Tort Claims Act be provided? Should the jurisdiction and function of the State Claims Commission be expanded to these cases to insure uniformity of treatment? Should municipalities be given the power to establish such commissions? Or should there be regional commissions? Should a new commission similar to the Workmen's Compensation Commission be given this jurisdiction?

Should a state fund be provided for payment of tort claims? If so, should it be financed by state appropriation or city contributions or by some new or additional tax? Or should each city have such a fund?

Should any and all tort damages in the ever expanding field be compensable by municipalities, or should there be a limitation to certain types or kinds of tort liability?

Out of which funds are judgments against cities to be paid? Is damage by reason of injury resulting from automobile collision caused by negligence of the operator of a waterworks vehicle to be paid from waterworks revenues or funds earmarked for those purposes or is it compensable from city funds and revenues allocated for fire or police departments?

Should there be a time limitation upon notice of claims, so that proper municipal authorities are enabled to properly investigate incidents out of which the claims arise? Or shall they be called upon to defend a claim three years after an alleged occurrence that went unreported to proper city authorities?

What is the status of city employees in regard to claims for injuries? Will there be a common law liability to them? What application will such rules as the fellow servant doctrine and assumption of risk have?

Are acts of malfeasance, misfeasance and nonfeasance all proper bases for recovery?

It is not necessary to speculate about possibilities with reference to liabilities that may be imposed upon our municipalities. A list of some liabilities that have been imposed in states where municipal tort immunity has been abolished follows:

(1) Failure to install a fire hydrant where others within a similar area were protected. *Veach* v. *City of Phoenix*, 427 P. 2d 335 (Ariz. 1967).

(2) Injuries to persons struck by suspected robber's automobile during a high speed chase by city police. *Evanoff* v. *City of St. Petersburg*, 186 So. 2d 68 (Fla. 1966).

(3) Failure to maintain streets and highways in safe condition. *Byne* v. *Americus*, 6 Ga. App. 48, 64

S. E. 285 (1909); *Jones* v. *Kane & Roach, Inc.,* 182 Misc. 37, 43 NYS 2d 140 (1943).

(4) Injury by a falling awning which extended over a sidewalk. *McHarge* v. *Newcomer & Co.,* 117 Tenn. 595, 100 S. W. 700 (1906).

(5) Injury to persons on property adjacent to municipally owned ball park by a ball hit or thrown from the park. *Robb* v. *Milwaukee,* 241 Wis. 432, 6 N. W. 2d 222 (1942).

(6) Failure to maintain proper warning barriers for protection of persons using sidewalks and highways who unintentionally deviate therefrom. *Bessemer* v. *Clowdus,* 261 Ala. 388, 74 So. 2d 259 (1954); *Gabbert* v. *Brownwood,* 176 S. W. 2d 344 (Tex. Civ. App. 1943).

(7) Child killed by injury on city property under attractive nuisance doctrine. *Peters* v. *Tampa,* 115 Fla. 666, 155 So. 854 (1934).

(8) Failure to adequately maintain drains or sewers to prevent clogging. *Tucson* v. *O'Reilly Motor Co.,* 64 Ariz. 240, 168 P. 2d 245; *Lobster Pot of Lowell* v. *Lowell,* 333 Mass. 31, 127 N. E. 2d 659 (1955).

(9) Negligence in placing, failing to remove or permitting, with constructive notice, a rope or clothes line across a sidewalk. *Albany* v. *Black,* 214 Ala. 359, 108 So. 49 (1926); *Shinnick* v. *Marshalltown,* 137 Iowa 72, 114 N. W. 542 (1908).

(10) Drowning of a child under attractive nuisance, nuisance, or negligence theories. *Peters* v. *Tampa,* 115 Fla. 666, 155 So. 854 (1954); *Doyle* v. *Chattanooga,* 128 Tenn. 433, 161 S. W. 997 (1913);

*Cates* v. *Bloomington,* 333 Ill. App. 189, 77 N. E. 2d 46 (1947).

(11) Explosion of butane gas stored in city's streets and alleys by a third party under a city permit. *Splinter* v. *Nampa,* 215 P. 2d 999 (Ida. 1950).

(12) Allowing fire in a city dump to spread to plaintiff's property. *Osborn* v. *Whittier,* 103 Cal. App. 2d 609, 230 P. 2d 132 (1951).

(13) Injury to child by flare placed in street to warn of recent road work under attractive nuisance doctrine. *Gilligan* v. *Butte,* 118 Mont. 350, 166 P. 2d 797 (1946).

(14) Injury to child in trying to light a warning lantern that had gone out. *Collins* v. *Chicago,* 321 Ill. App. 73, 52 N. E. 2d 473 (1943).

(15) Damage caused by operation of fire department vehicles. *Miami* v. *McCorkle,* 145 Fla. 109, 199 So. 575 (1940); *Baltimore* v. *Fire Ins. Salvage* Corp., 219 Md. 75, 148 A. 2d 444; *Cavagnaro* v. *Napa,* 86 Cal. App. 2d 517, 195 P. 2d 25 (1948); *Peerless Laundry Services* v. *Los Angeles,* 109 Cal. App. 2d 703, 241 P. 2d 269 (1952).

(16) Damages from temporary obstructions in streets. *Crow* v. *San Antonio,* 157 Tex. 250, 301 S. W. 2nd 628 (1957); *Rueter* v. *Versailles,* 213 F. 2d 233 (CA Ill. 1954); *Denver* v. *Austria,* 136 Colo. 454, 318 P. 2d 1101 (1957).

(17) Negligent operation of parks and equipment. *Kingsport* v. *Lane,* 35 Tenn. App. 183, 243 S. W. 2d 289 (1951).

(18) Injuries from acts in construction or repair of sewers or drains. *Galluzzi* v. *Beverly,* 309 Mass. 135, 34 N. E. 2d 492 (1941).

(19) Failure to erect traffic warnings against entering a street partially barred or obstructed by construction or improvement work. *Austin* v. *Schmedes*, 154 Tex. 416, 279 S. W. 2d 326 (1955).

(20) Injuries from falls on stairways. *Knoxville* v. *Bailey*, 222 F. 2d 520 (CA Tenn. 1955).

(21) Operation of street lighting facilities. *Hooton* v. *Burley*, 70 Ida. 369, 219 P. 2d 651 (1950).

(22) Injuries from overhanging tree limbs. *Montgomery* v. *Quinn*, 246 Ala. 154, 19 So. 2d 529 (1944); *Tate* v. *Greenville*, 228 S. C. 530, 91 S. E. 2d 161 (1956).

(23) Injuries because of an accumulation of water at a street intersection. *Booth* v. *Dist. of Columbia*, 100 App. D. C. 32, 241 F. 2d 437 (1956).

(24) Injuries to an unattended prisoner. *Hargrove* v. *Cocoa Beach*, 96 So. 2d 130 (Fla. 1957).

(25) Injuries due to defective condition of sidewalk. *Winchester* v. *Finchum*, 201 Tenn. 604, 301 S. W. 2d 341 (1957); *Claessens* v. *Troy*, 272 App. Div. 971, 71 NYS 2d 571 (1947).

(26) Injuries from fall in municipal parking lot. *Rhodes* v. *Palo Alto*, 100 Cal. App. 2d 336, 223 P. 2d 639 (1950).

(27) Injuries from fall by slipping on wet paint used to designate parking spaces on street. *Austin* v. *Daniels*, 160 Tex. 628, 335 S. W. 2d 753 (1960).

Is there to be liability for damages in Arkansas arising by reason of these and other things which come to mind:

Injury to an intoxicated prisoner who falls out of a bunk while unattended?

Injury to an unattended prisoner by another prisoner?

Injury to a person arrested by what a jury, after deliberation, may determine to have been an excessive use of force?

Injury from the falling of a defective bridge?

Injuries and property damage in riots a city fails to suppress?

Damages from a nuisance created by failure to collect garbage promptly or properly?

Injuries or damages by reason of inability of city to perform a usual function because of a strike of city employees?

Injuries in and about municipal swimming pools, parks, playgrounds, golf courses and other recreational facilities?

Injuries to which the malfunction of traffic lights was a contributing cause?

Injuries or damages by reason of failure of city authorities to condemn or demolish buildings of private owners in a dangerous condition?

Damages from slander by city officer or employee?

Damages for malicious prosecution upon acquittal of persons arrested or prosecuted by city officials? Or for false imprisonment?

Damages for malpractice in city hospitals?

What effect will this decision have on liability insurance rates of private citizens?

I feel that the court has not given due regard to Amendment No. 10 which had the very desirable purpose of requiring our cities and counties to operate on a cash basis. One judgment in one tort case could exhaust all the revenues of many of our cities and towns so that all governmental functions would cease. This brings to mind another question. Would a tort judgment be paid from the revenues of the year in which the tort was committed or that in which the judgment was rendered or that in which the judgment becomes final? It would seem logical that it be paid out of the revenues of the year in which the tort was committed, which would likely be exhausted before the damages could be ascertained in many cases. This is another problem that might be solved by legislative action.

I also feel that the majority has not considered the fact that many required city services are activities that might well be called inherently dangerous. At least they involve a high degree of risk. The cities have no option about whether they will perform most of these services, as a private individual or corporation would. I submit that at least these activities should involve immunity. There is at least doubt whether the constitutional power of granting immunity can be exercised by the General Assembly in view of today's decision and Article 2, § 13, of our Constitution.

While the majority seek to limit the application of today's decision to cases which do not involve judgment and discretion, I do not understand the limitation. Most of the acts of a municipal officer, servant or employee involve the exercise of some judgment or discretion.

I am also concerned about the effect of today's decision upon counties, school districts, improvement districts, and other agencies performing governmental

functions. I do not know whether we should consider them to be bound by this decision or not.

It gives me cause for concern that we unhesitantly applied the doctrine of tort immunity in *City of Fort Smith* v. *Anderson,* 241 Ark. 824, 410 S. W. 2d 597, less than one month before the submission of this case, and now permit recovery of one whose alleged damage occurred two years and nine months prior to that a jury found to have been inflicted upon the plaintiffs in that case.

The difficulty of the majority in deciding just what claimants shall be beneficiaries of today's decision emphasizes the fact that the court is acting legislatively. I do not agree that the solution is a proper one. I would prefer that we rule on the cases as they come here and without declaring whether rules are prospective or retroactive in operation.

I respectfully submit that the investigative powers of the General Assembly, not available to us, could have reached a sounder conclusion in this matter. Such an investigation would probably not have created more questions than it answered.

I fully agree with the remarks of the Chief Justice with reference to judicial change of the common law. I agree that courts have the power to overrule their *own* decisions, but not the common law adopted by this state. If Ark. Stat. Ann. § 1-101 (Repl. 1956) does not mean that this law can be altered or repealed by the General Assembly, only, then, I ask, what does it mean?

With all due respect for my brethren of the majority, whom I hold in the highest esteem, I cannot help but feel that this step is unwise, is in violation of the separation of powers prescribed by Article 4, § 2, of our Constitution and that it is being taken with only a superficial examination of the ultimate consequences. Legislative attention is more plainly indicated now than ever before.