490 P.2d 1079 (1971)
Galela NEWMAN, Guardian of the Person and Estate of Jack Karns Newman, Plaintiff in Error,
v.
The STATE of Oklahoma ex rel. the BOARD OF REGENTS FOR the OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES, Acting For and on Behalf of OKLAHOMA STATE UNIVERSITY, and Claude F. Jones, Defendants in Error.
No. 42837.
Supreme Court of Oklahoma.
June 29, 1971.
Rehearing Denied November 30, 1971.
Fitzgerald, Houston & Worthington, by Clee Fitzgerald, Stillwater, for plaintiff in error.
*1080 E. Moses Frye, Stillwater, G.T. Blankenship, Atty. Gen., W.J. Monroe, First Asst. Atty. Gen., Oklahoma City, for defendants in error.
Howard K. Berry, Jr., Oklahoma City, for Oklahoma Trial Lawyers Assn., amicus curiae.
BLACKBIRD, Justice.
Plaintiff in error's son and ward, Jack Karns Newman, was injured in an automobile collision between the Volkswagen he was driving and a Ford Station Wagon driven by one Claude F. Jones, allegedly employed by the State of Oklahoma at Oklahoma State University. The collision occurred during the night of December 10, 1965, on a State Highway about 7 miles east of Stillwater.
In April, 1967, the First Session of the Thirty-First Oklahoma Legislature enacted its Senate Joint Resolution No. 19 (S.L. 1967, pp. 718-719, both inclusive), hereinafter referred to merely as "S.J. 19", waiving this State's immunity from suit by plaintiff in error for the recovery of any damages sustained in said collision by reason of the negligence of said University's employees and agents.
When plaintiff in error (hereinafter referred to as "plaintiff") thereafter instituted the present action, almost 5 months later, to recover the sum of $700,000.00 from the defendants in error, hereinafter referred to as "defendants", as damages for her ward's injuries, she alleged, among other things, that the collision was caused by the negligence of Jones and that Jones was acting within the scope of his employment at the University. Treating her action as a suit against the State of Oklahoma (among others), plaintiff attached a copy of S.J. 19 to her petition and plead that the State had thereby waived its immunity from it. Recognizing also the well-settled legal distinction between the State's immunity from suit and its immunity from liability (33 A.L.R.3d 703, 768), plaintiff also attached to her petition a copy of the Twenty-Fourth Oklahoma Legislature's Senate Joint Resolution No. 28 (S.L. 1953, p. 508), hereinafter referred to merely as "S.J. 28", and plead that the State had thereby waived its immunity from liability for the negligent acts of its employees.
The trial court sustained defendants' general demurrer to plaintiff's petition, in effect, holding that the action was not maintainable as a suit against the State and that the above cited Senate Joint Resolutions (by which the State had allegedly consented to subject itself to actionable accountability) were nullities, specifically declaring them unconstitutional. She thereupon elected to stand upon her petition without amendment; and, after her motion for a new trial was overruled, lodged the present appeal.
For reversal, plaintiff urges both that it is time for this Court to abolish "the doctrine" of State sovereign immunity from tort liability and that the Legislature has accomplished this, insofar as it extends to such liability for the acts of its employees, by S.J. 28. On the other hand, defendants argue that there is no law giving this Court legal basis or authority for overturning this State's immunity from liability for the torts of its employees, and that S.J. 28 is inadequate as such a law.
We need not enter into a detailed discussion as to the various reasons plaintiff contends, on the one hand, that S.J. 28 is sufficient to waive, generally, the State's immunity from liability for the torts of all of its employees, and that defendants contend, on the other hand, that S.J. 28 has been recognized as unconstitutional by not being incorporated in our permanent statute books. This would entail treating this Joint Resolution as a law, and might extend to determining whether it is of the unconstitutional variety because of the admittedly special nature of its second paragraph and Section 2 (pertaining, as it does, to the waiver of the State's immunity from suit by one man, E.F. Christner), or whether, notwithstanding this, the rest of the Resolution (pertaining to a waiver of *1081 the State's immunity from liability for the negligence of its employees) may be considered general in nature (under the criteria prescribed for determining whether laws are in compliance with, or in violation of, Art. 5, § 59, of the Oklahoma Constitution) and severable from the Resolution's constitutionally offensive part. Nor is this necessary because of the Trial Judge's expressed views, for if his ruling on defendants' demurrer was correct in result, the process by which he arrived at that determination need not control our decision. See Chaney v. Reddin, 201 Okl. 264, 205 P.2d 310, 8 A.L.R.2d 337, and City of Tulsa v. Thomas, 89 Okl. 188, 214 P. 1070.
Our decision is based upon the character of legislative joint resolutions. In an early case, this Court held that the capacity of such an enactment to alter or modify existing laws is restricted, under the Oklahoma Constitution, to such changes of a temporary character. See Oklahoma News Co. v. Ryan, 101 Okl. 151, 224 P. 969 (2nd syll.). This restriction has been recognized in the later cases of Stephens Produce Co. v. Stephens, Okl., 332 P.2d 674, and Ward v. State, 176 Okl. 368, 56 P.2d 136; and, for the purpose of determining whether legislative enactments effect a change in it, the common law doctrine of sovereign immunity from tort liability has been treated as the "existing law" of this State (in the absence of abrogation of the doctrine by express provisions of our statutes or Constitution) since as early as 1907. In this connection, notice the discussion in James v. Trustees of Wellston Twp., 18 Okl. 56, 90 P. 100, 13 L.R.A.,N. S., 1219, 11 Ann.Cas. 938, and State v. Fletcher, 168 Okl. 538, 540, 34 P.2d 595, 596.
Had plaintiff's petition alleged facts showing that the vehicle Jones was driving was owned by Oklahoma State University, then this case might present a different issue in view of Tit. 70, O.S. 1968 Supp., § 2115, but it alleges no such facts. Inasmuch as plaintiff's petition contains no allegations to the contrary, we must assume that Jones's employment is within the ambit of Oklahoma State University's principal function, which is education. This Court early held that, in Oklahoma, the education of this State's citizenship is a governmental function. See Consolidated School Dist. No. 1 v. Wright, 128 Okl. 193, 196, 261 P. 953, 955, 56 A.L.R. 152, 156, and other authorities cited in Dahl v. Hughes, Okl., 347 P.2d 208, 210.
As the enactment of S.J. 28 in 1953 can be regarded as no more than an attempt at changing existing law temporarily, and for the primary purpose of authorizing E.F. Christner to sue the State for the alleged wrongful death of his son, we hold that said Resolution was ineffective to abrogate the State's immunity against the present suit of plaintiff, some 14 years later. Our view that this Resolution lacks the import and effect of a general law abrogating the State's immunity to liability for the torts of its employees is not inconsistent with the view the Trial Judge evidently had, when, in announcing his ruling on defendants' demurrer, he stated: "* * * the Legislature of the State of Oklahoma has not passed any general Tort Claims Act and did not intend to do so in 1953 by that Resolution * * *".
In accord with the foregoing, the ruling and judgment of the trial court is hereby affirmed.
BERRY, C.J., DAVISON, V.C.J., and WILLIAMS, JACKSON and LAVENDER, JJ., concur.
IRWIN, J., concurs in result.
HODGES and McINERNEY, JJ., dissent.
HODGES, Justice (dissenting).
Governmental immunity is an anachronism that has long outlived its purpose, design or reasoning. The doctrine had its dubious inception in the feudal days where the authority was the King having some claim of divine rights and the medieval notion that the King can do no wrong. Perhaps *1082 the following caricature more illustrates its ludicrous beginning:
A long time ago a lawyer was employed by an unfortunate fellow who had lost his leg when recklessly run down by the King's carriage. Finding a great reluctance on the part of judges, who were appointed by the King, to entertain his poor client's case, the lawyer resolved to go directly to the King.
On that historic occasion the King graciously received the counsel and his disabled client.
The matter was shortly and respectfully presented to the monarch.
"And pray, counsel," queried the King, "what does this have to do with me?"
The lawyer explained, "Why, Sire, the carriage is your excellency's, and the coachman is in your majesty's personal service, and my injured client was without fault. If it please my lord, redress for the wrong is sought at the pleasure of your highness."
The king fenced for time by suggesting, "You, of course could make claim of the royal coachman."
The lawyer lowered his head, but replied firmly, "True, my lord, but the coachman has not a pot, and by royal decree the wrongful acts of a man's coachman are the wrongful acts of the man."
"Yes," mused the King, "please continue lawyer."
"Then," the lawyer persisted, "would not the wrong of the royal coachman be the wrong of your majesty's?"
"No," shot back the King, "It most certainly would not."
In the utter silence following the royal disclaimer, the lawyer whispered, "Why, Sire, why is this so?"
"Because the King can do no wrong," proclaimed the King."
As the stunned counsel and his client retired from the throne the ruler cried out, "Seize the impertinent barrister and the wretch who accompanies him and throw him in the dungeon. The nerve of the fellow to suggest the King could do wrong."
And thus was born the doctrine of sovereign immunity.
In an old English legal commentary (IBL COMM. *242) the basis for the doctrine was explained:
"* * * no suit or action can be brought against the King, even in civil matters, because no court can have jurisdiction over him. For all jurisdiction implies superiority of power. Authority to try would be vain and idle, without an authority to redress; and the sentence of a court would be contemptible, unless that court had power to command the execution of it; but who, says Finch, shall command the King."
The doctrine comes to us from the English common law. It can be traced to the case of Russell v. Men of Devon, 2 Term Rep. 667, 100 Eng.Rep. 359, which was a suit against an unincorporated town. From there the idea spread and expanded to this country when the doctrine was adopted in the case of Mower v. Inhabitants of Leicester, 9 Mass. 247, 249. The rule in Oklahoma appears to be an attempt to hold on to this concept, where today in England, as in Canada, the doctrine of governmental immunity has been abrogated.
Needless to say the ancient reasons are no longer applicable, if they ever were. We have no King and no claim of divinity for our government has been asserted. Yesterday's excuses are not today's answers.
A modern concept urged by some for continuing the doctrine of governmental immunity is that allowance of such lawsuits would potentially bankrupt the government unit involved, particularly at the lower levels, and that governmental functions would be severely hampered or curtailed. But these modern days reasons are likewise assailable.
Governmental functions in those jurisdictions where the immunity doctrine has *1083 been abrogated have continued to operate without undue delay or interference, and the availability of insurance eliminates, any threat of a bankrupt state. A prospective holding would allow the state, and their subdivisions sufficient time to anticipate their needs and prepare their budgets accordingly. Thus, the reasons for retention of the doctrine no longer exist, and what vestige remains is weak, when compared to the idea of "where there is a wrong there is a remedy", which the Constitution of this State recognized in Article 11, Section 6, and the right of the individual to be compensated for his injuries due to the negligence of another. As stated by the author in an article in the Oklahoma Law Review, Vol. 7, p. 48, "In this day and age, when the political emphasis seem to be upon the rights of the individual, the continued adherence to the doctrine seems to be out of line with the times. Whatever the reasons be, political or practical, reason and justice demand the sharp limitation of the doctrine."
In recent years the doctrine of governmental immunity has been criticized by many authorities. See, 161 A.L.R. 367; Law of Torts, Harper, 1933 Ed. Section 296 p. 655; 34 Yale Law Journal 229; Prosser on Torts, 3rd Ed. p. 1010; 40 Tex. Law Review 151; 30 Harvard Law Review 20; 31 U.Cinc. Law Review 307; Okl. Law Review, Vol. 7 p. 2.
The following states in recent years have in one way or another abolished, limited, or severely questioned sovereign immunity or have decided to abrogate the mystical distinction between governmental and proprietary functions:
Florida (1957)  Hargrove v. Town of Cocoa Beach, Fla., 96 So.2d 130.
Illinois (1959)  Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163 N.E.2d 89.
California (1961)  Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal. Rptr. 89, 359 P.2d 457.
Michigan (1961)  Williams v. City of Detroit, 364 Mich. 231, 111 N.W.2d 1.
Alaska (1962)  City of Fairbanks v. Schaible, Alaska, 375 P.2d 201.
Minnesota (1962)  Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795.
Wisconsin (1962)  Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618.
Arizona (1962)  Hernandez v. County of Yuma, 91 Ariz. 35, 369 P.2d 271.
Kentucky (1964)  Haney v. City of Lexington, Ky., 386 S.W.2d 738.
Arkansas (1968)  Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45.
Nebraska (1968-69)  Johnson v. Municipal University of Omaha, 184 Neb. 512, 169 N.W.2d 286.
Indiana (1969)  Perkins v. State of Indiana, Ind., 251 N.E.2d 30.
Kansas (1969)  Carroll v. Kittle, 203 Kan. 841, 457 P.2d 21.
New Jersey (1970)  Willis v. Department of Conservation & Economic Development, 55 N.J. 534, 264 A.2d 34.
Rhode Island (1970)  Becker v. Beaudoin, R.I., 261 A.2d 896.
Idaho (1970)  Hopper v. Idaho Board of Highway Directors, 93 Idaho 795, 473 P.2d 937.
Colorado (1971)  Evans v. The Board of County Commissioners of The City of El Paso, Colo., 482 P.2d 968.
Most jurisdictions have severely limited the doctrine by judicial ruling, especially as to municipal corporations, including Oklahoma. City of Oklahoma v. Hill, 6 Okl. 114, 50 P. 242 (1897). We have found no jurisdiction that has not abridged the doctrine either by way of judicial decree or legislative action. The doctrine is currently in disfavor universally.
The very illogic of the political subdivision immunity rule has led many courts, including *1084 this one, to soften the impact of such immunity by distinguishing between "governmental" and "proprietary" functions of State subdivisions, restricting the application of the doctrine to the former. Oklahoma City v. Taylor, Okl., 470 P.2d 325 (1970). But even this "distinction" leads to often capricious results, Oklahoma City v. Taylor, supra (concurring opinion, 470 P.2d 330).
We have seen that the reasons for the continuation of this doctrine are no longer valid, on the basis of either the ancient or modern reasons. The only real impediment is that of stare decisis. The rule of stare decisis is an important one and continuity of rulings are essential to the orderly administration of justice. But where the reasons for a judicial rule no longer exist it is time to judicially change the rule.
In the final analysis, it appears that the doctrine of sovereign immunity, at least for the more-or-less routine functions of the quasi-corporate subdivisions of the State, is so clearly against the modern trend and spirit of the law, so illegitimately misinterpreted from the mists of mythology and misapplied to the living present, and so clearly unjust, as to constitute by its very existence (or continuation) a compelling cause for bitter discontentment and discord in our civil law. Indeed, no defense of the doctrine is now possible except its very antiquity, but to this sterile argument Mr. Justice Holmes replied many years ago:
"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."
If the above attempt to discredit the doctrine of governmental immunity has any merit then should this change be made by our court or the legislature? As pointed out, the doctrine has its origin in the judiciary. It is not a product of statutory enactment or constitutional mandate. Neither our Constitution nor our statutes have embraced it as a general rule of law. It, therefore, behooves the courts, who invoke it in the first place, to eradicate the doctrine  not the legislature. In an article in the Kansas Law Review, Vol. 16, p. 275, the author, in pointing out the responsibility of the courts, comments:
"It must be recognized that the role of the judiciary is not necessarily to have the ultimate word on governmental liability or immunity. It may well be that the legislature will have the final say. But if governmental tort immunity is to exist, it should exist only where and to the extent that the legislature, after the detailed inquiry and study which only a legislature can give to the subject, has found it unavoidably necessary. It should no longer be suffered to exist on the now-empty premise that it is a first principle of the common law."
While our legislature has not enacted a general law of governmental immunity, it has authorized various state agencies to acquire public liability insurance in certain areas, including the Board of Regents for the Oklahoma State System of Higher Education, 70 O.S.Supp. 1970, § 2115. Also, in 1965 the legislature enacted the Governmental Tort Liability Act for cities in Oklahoma over a population of 200,000 which subjects these municipalities to a limited liability for torts of their officers and employees acting within the scope of their employment arising out of a governmental function.
I do not interpret these acts to mean that in all other areas the legislature has retained the immunity doctrine by statutory fiat. They merely show us that the legislature acknowledges sovereign immunity as a court made law without any legislative action, but that there were isolated areas in government where the need for relief was immediate and urgent and they chose to exercise their legislative prerogative by these sporadic acts. As often happens in legislative matters it was easier to relieve the pain than the disease itself, "and leave *1085 to the court whether it should adhere to its own rule of immunity in other areas." Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal. Rptr. 89, 359 P.2d 457. In the Muskopf case, where the court abrogated governmental tort immunity in California, Justice Traynor answered the "Pre-emption" argument of the legislature as follows:
"We are not here faced with a situation in which the Legislature has adopted an established judicial interpretation by repeated re-enactment of a statute. * * * Nor are we faced with a comprehensive legislative enactment designed to cover a field. What is before us is a series of sporadic statutes, each operating on a separate area of governmental immunity where its evil was felt most. Defendant would have us say that because the Legislature has removed governmental immunity in these areas we are powerless to remove it in others. We read the statutes as meaning only what they say: that in the areas indicated there shall be no governmental immunity. They leave to the court whether it should adhere to its own rule of immunity in other areas."
The reasons for abolishing the doctrine of governmental immunity are over-whelming and persuasive. A primitive concept that prevents a person from being justly compensated for a serious, painful and permanent injury just because the wrong doer was an employee of the state should be reexamined and altered. Especially is this so, where the origin and purpose of the doctrine is vague and obscure and has continued to exist "only by the force of inertia." Its sojourn into our modern society should be halted.
I respectfully dissent.
McINERNEY, Justice (dissenting).
I concur generally in the views expressed by Justice Hodges in his dissenting opinion. I would not shield a quasi-governmental corporation from the responsibility of conducting its affairs with ordinary care. I believe Justice Hodges is correct in his analysis, and criticism, of the outmoded doctrine of governmental immunity when applied to a situation involving the alleged negligent operation of an automobile by an employee of the University.
I assume that it may be agreed that the University is entitled to maintain an action against Jack Karns Newman upon an allegation of his negligence resulting in damage to the automobile owned by the University. Mutuality of remedy by denying access to the courts to only one litigant is thus perpetuated by the majority opinion. I would not treat the parties on such an unequal basis in the conduct of every day affairs.
The Legislature has provided authorization for the Boards of Regents, institutions and agencies comprising the Oklahoma State System of Higher Education to carry public liability insurance on vehicles owned and operated by these entities. 70 O.S. Supp. 1970, § 2115 (Laws 1965). The petition does not state that the automobile driven by the alleged employee of the University was owned by the University. Application of the liability insurance provision is thus unclear. But the purpose of its enactment seems clear: The Legislature recognizes the responsibility of government to its citizens. That recognition is frustrated when the quasi-governmental entity clings to a doctrine not originally intended for its benefit. The broad brush application of the doctrine of sovereign immunity; that a university is "sovereign," must yield, in my opinion, to the unambiguous language of Article 2, §§ 6 and 7 in the Oklahoma Constitution relating to due process and access to courts of justice. And this seems particularly true when the Legislature has expressed its acquiescence in a specific governmental activity.